(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL. *v.* PREAP ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 16–1363. Argued October 10, 2018—Decided March 19, 2019*

Federal immigration law empowers the Secretary of Homeland Security to arrest and hold a deportable alien pending a removal decision, and generally gives the Secretary the discretion either to detain the alien or to release him on bond or parole. 8 U. S. C. §1226(a). Another provision, §1226(c)—enacted out of "concer[n] that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings," *Demore* v. *Kim*, 538 U. S. 510, 513—sets out four categories of aliens who are inadmissible or deportable for bearing certain links to terrorism or for committing specified crimes. Section 1226(c)(1) directs the Secretary to arrest any such criminal alien "when the alien is released" from jail, and §1226(c)(2) forbids the Secretary to release any "alien described in paragraph (1)" pending a determination on removal (with one exception not relevant here).

Respondents, two classes of aliens detained under §1226(c)(2), allege that because they were not immediately detained by immigration officials after their release from criminal custody, they are not aliens "described in paragraph (1)," even though all of them fall into at least one of the four categories covered by §§1226(c)(1)(A)–(D). Because the Government must rely on §1226(a) for their detention, respondents argue, they are entitled to bond hearings to determine if they should be released pending a decision on their status. The District Courts ruled for respondents, and the Ninth Circuit affirmed.

_____

*Together with *Wilcox, Acting Field Office Director, Immigration and Customs Enforcement, et al.* v. *Khoury et al.* (see this Court's Rule 12.4), also on certiorari to the same court.

Syllabus

*Held*: The judgments are reversed, and the cases are remanded.

831 F. 3d 1193 and 667 Fed. Appx. 966, reversed and remanded.

JUSTICE ALITO delivered the opinion of the Court with respect to Parts I, III–A, III–B–1, and IV, concluding that the Ninth Circuit's interpretation of §1226(c) is contrary to the plain text and structure of the statute. Pp. 10–17, 20–26.

   (a) The statute's text does not support the argument that because respondents were not arrested immediately after their release, they are not "described in" §1226(c)(1). Since an adverb cannot modify a noun, §1226(c)(1)'s adverbial clause "when . . . released" does not modify the noun "alien," which is modified instead by the adjectival clauses appearing in subparagraphs (A)–(D). Respondents contend that an adverb can "describe" a person even though it cannot modify the noun used to denote that person, but this Court's interpretation is not dependent on a rule of grammar. The grammar merely complements what is conclusive here: the meaning of "described" as it appears in §1226(c)(2)—namely, "to communicate verbally . . . an account of salient identifying features," Webster's Third New International Dictionary 610. That is the relevant definition since the indisputable job of the "descri[ption] in paragraph (1)" is to "identif[y]" for the Secretary which aliens she must arrest immediately "when [they are] released." Yet the "when . . . released" clause could not possibly describe aliens in that sense. If it did, the directive given to the Secretary in §1226(c)(1) would be incoherent. Moreover, Congress's use of the definite article in "when the alien is released" indicates that the scope of the word "alien" "has been previously specified in context." Merriam-Webster's Collegiate Dictionary 1294. For that noun to have been previously specified, its scope must have been settled by the time the "when . . . released" clause appears at the end of paragraph (1). Thus, the class of people to whom "the alien" refers must be fixed by the predicate offenses identified in subparagraphs (A)–(D). Pp. 10–14.

   (b) Subsections (a) and (c) do not establish separate sources of arrest and release authority; subsection (c) is a limit on the authority conferred by subsection (a). Accordingly, all the relevant detainees will have been arrested by authority that springs from subsection (a), and that fact alone will not spare them from subsection (c)(2)'s prohibition on release. The text of §1226 itself contemplates that aliens arrested under subsection (a) may face mandatory detention under subsection (c). If §1226(c)'s detention mandate applied only to those arrested pursuant to subsection (c)(1), there would have been no need for subsection (a)'s sentence on the release of aliens to include the words "[e]xcept as provided in subsection (c)." It is also telling that subsection (c)(2) does not limit mandatory detention to those arrested

"pursuant to" subsection (c)(1) or "under authority created by" subsection (c)(1), but to anyone so much as "described in" subsection (c)(1). Pp. 15–17.

(c) This reading of §1226(c) does not flout the interpretative canon against surplusage. The "when . . . released" clause still functions to clarify when the duty to arrest is triggered and to exhort the Secretary to act quickly. Nor does this reading have the incongruous result of forbidding the release of a set of aliens whom there is no duty to arrest in the first place. Finally, the canon of constitutional avoidance does not apply where there is no ambiguity. See *Warger* v. *Shauers*, 574 U. S. 40, 50. Pp. 20–26.

JUSTICE ALITO, joined by THE CHIEF JUSTICE and JUSTICE KAVANAUGH, concluded in Parts II and III–B–2:

(a) This Court has jurisdiction to hear these cases. The limitation on review in §1226(e) applies only to "discretionary" decisions about the "application" of §1226 to particular cases. It does not block lawsuits over "the extent of the Government's detention authority under the 'statutory framework' as a whole." *Jennings* v. *Rodriguez*, 583 U. S. ___, ___. For reasons stated in *Jennings,* "§1252(b)(9) does not present a jurisdictional bar." See *id.*, at ___. Whether the District Court in the *Preap* case had jurisdiction under §1252(f)(1) to grant injunctive relief is irrelevant because the court had jurisdiction to entertain the plaintiffs' request for declaratory relief. And, the fact that by the time of class certification the named plaintiffs had obtained either cancellation of removal or bond hearings did not make these cases moot. At least one named plaintiff in both cases could have been returned to detention and then denied a subsequent bond hearing. Even if that had not been so, these cases would not be moot because the harms alleged are transitory enough to elude review. *County of Riverside* v. *McLaughlin*, 500 U. S. 44, 52. Pp. 7–10.

(b) Even assuming that §1226(c)(1) requires immediate arrest, the result below would be wrong, because a statutory rule that officials "'shall' act within a specified time" does not by itself "preclud[e] action later," *Barnhart* v. *Peabody Coal Co.*, 537 U. S. 149, 158. This principle for interpreting time limits on statutory mandates was a fixture of the legal backdrop when Congress enacted §1226(c). Cf. *Woodford* v. *Garceau*, 538 U. S. 202, 209. Pp. 17–20.

JUSTICE THOMAS, joined by JUSTICE GORSUCH, concluded that three statutory provisions—8 U. S. C. §§1252(b)(9), 1226(e), and 1252(f)(1)—limit judicial review in these cases and it is unlikely that the District Courts had Article III jurisdiction to certify the classes. Pp. 1–6.

ALITO, J., announced the judgment of the Court and delivered the

opinion of the Court with respect to Parts I, III–A, III–B–1, and IV, in which ROBERTS, C. J., and THOMAS, GORSUCH, and KAVANAUGH, JJ., joined, and an opinion with respect to Parts II and III–B–2, in which ROBERTS, C. J., and KAVANAUGH, J., joined. KAVANAUGH, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which GORSUCH, J., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1363

_____

## KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* MONY PREAP, ET AL.

## BRYAN WILCOX, ACTING FIELD OFFICE DIRECTOR, IMMIGRATION AND CUSTOMS ENFORCEMENT, ET AL., PETITIONERS *v.* BASSAM YUSUF KHOURY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 19, 2019]

JUSTICE ALITO announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III–A, III–B–1, and IV, and an opinion with re-spect to Parts II and III–B–2, in which THE CHIEF JUSTICE and JUSTICE KAVANAUGH join.

Aliens who are arrested because they are believed to be deportable may generally apply for release on bond or parole while the question of their removal is being de-cided.  These aliens may secure their release by proving to the satisfaction of a Department of Homeland Security officer or an immigration judge that they would not en-danger others and would not flee if released from custody.

Congress has decided, however, that this procedure is too risky in some instances.  Congress therefore adopted a special rule for aliens who have committed certain dan-gerous crimes and those who have connections to terror-ism.  Under a statutory provision enacted in 1996, 110

Stat. 3009–585, 8 U. S. C. §1226(c), these aliens must be arrested "when [they are] released" from custody on criminal charges and (with one narrow exception not involved in these cases) must be detained without a bond hearing until the question of their removal is resolved.

In these cases, the United States Court of Appeals for the Ninth Circuit held that this mandatory-detention requirement applies only if a covered alien is arrested by immigration officials as soon as he is released from jail. If the alien evades arrest for some short period of time— according to respondents, even 24 hours is too long—the mandatory-detention requirement is inapplicable, and the alien must have an opportunity to apply for release on bond or parole. Four other Circuits have rejected this interpretation of the statute, and we agree that the Ninth Circuit's interpretation is wrong. We therefore reverse the judgments below and remand for further proceedings.

## I
### A

Under federal immigration law, aliens present in this country may be removed if they fall "within one or more . . . classes of deportable aliens." 8 U. S. C. §1227(a). In these cases, we focus on two provisions governing the arrest, detention, and release of aliens who are believed to be subject to removal.

The first provision, §1226(a),[1] applies to most such

———————

[1] This provision states:

"(a) Arrest, detention, and release

"On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

aliens, and it sets out the general rule regarding their arrest and detention pending a decision on removal. Section 1226(a) contains two sentences, one dealing with taking an alien into custody and one dealing with detention. The first sentence empowers the Secretary of Homeland Security[2] to arrest and hold an alien "pending a decision on whether the alien is to be removed from the United States." The second sentence *generally* gives the Secretary the discretion either to detain the alien or to release him on bond or parole. If the alien is detained, he may seek review of his detention by an officer at the Department of Homeland Security and then by an immigration judge (both exercising power delegated by the Secretary), see 8 CFR §§236.1(c)(8) and (d)(1), 1003.19, 1236.1(d)(1) (2018); and the alien may secure his release if he can convince the officer or immigration judge that he poses no flight risk and no danger to the community. See §§1003.19(a), 1236.1(d); *Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006). But while 8 U. S. C. §1226(a) generally permits an alien to seek release in this way, that provision's sentence on release states that all this is subject to an exception that is set out in §1226(c).

Section 1226(c) was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, and it sprang from a "concer[n] that deportable criminal

––––––––––

"(B) conditional parole; but

"(3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization."

[2] We replace "Attorney General" with "Secretary" because Congress has empowered the Secretary to enforce the Immigration and Nationality Act, 8 U. S. C. §1101 *et seq.*, though the Attorney General retains the authority to administer removal proceedings and decide relevant questions of law. See, *e.g.*, 6 U. S. C. §§202(3), 251, 271(b), 542 note, 557; 8 U. S. C. §§1103(a)(1) and (g), 1551 note.

aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Demore* v. *Kim*, 538 U. S. 510, 513 (2003). To address this problem, Congress mandated that aliens who were thought to pose a heightened risk be arrested and detained without a chance to apply for release on bond or parole.

Section 1226(c) consists of two paragraphs, one on the decision to take an alien into "[c]ustody" and another on the alien's subsequent "[r]elease."[3]   The first paragraph (on custody) sets out four categories of covered aliens, namely, those who are inadmissible or deportable on specified grounds.   It then provides that the Secretary must take any alien falling into one of these categories "into custody" "when the alien is released" from criminal custody.

The second paragraph (on release from immigration custody) states that "an alien described in paragraph (1)" may be released "only if [the Secretary] decides" that release is "necessary to provide protection" for witnesses or others cooperating with a criminal investigation, or their relatives or associates.   That exception is not implicated in the present cases.

The categories of predicates for mandatory detention identified in subparagraphs (A)–(D) generally involve the commission of crimes.   As will become relevant to our analysis, however, some who satisfy subparagraph (D)— *e.g.*, close relatives of terrorists and those who are thought likely to engage in terrorist activity, see 8 U. S. C. §1182(a)(3)(B)(i)(IX)—may never have been charged with any crime in this country.[4]   Still, since the vast majority of

_____

    [3] The full text of §1226(c) is set out *infra*, at 10–11.

    [4] Nevertheless, such cases appear to be rare. See *Straker* v. *Jones*, 986 F. Supp. 2d 345, 357, n. 8 (SDNY 2013) (citing *Gomez* v. *Napolitano*, 2012 U. S. App. LEXIS 27076 (CA2, June 5, 2012)). But see *Alafyouny* v. *Chertoff*, 2006 WL 1581959, *3, *24 (ND Tex., May 19,

mandatory-detention cases do involve convictions, we follow the heading of subsection (c), as well as our cases and the courts below, in referring to aliens who satisfy subparagraphs (A)–(D) collectively as "criminal aliens."

The Board of Immigration Appeals has held that subsection (c)(2), which requires the detention of aliens "described in" subsection (c)(1), applies to all aliens who fall within subparagraphs (A)–(D), whether or not they were arrested immediately "when [they were] released" from criminal custody. *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001) (en banc).

B

Respondents in the two cases before us are aliens who were detained under §1226(c)(2)'s mandatory-detention requirement—and thus denied a bond hearing—pending a decision on their removal. See *Preap* v. *Johnson*, 831 F. 3d 1193 (CA9 2016); *Khoury* v. *Asher*, 667 Fed. Appx. 966 (CA9 2016). Though all respondents had been convicted of criminal offenses covered in §§1226(c)(1)(A)–(D), none were arrested by immigration officials immediately after their release from criminal custody. Indeed, some were not arrested until several years later.

Respondent Mony Preap, the lead plaintiff in the case that bears his name, is a lawful permanent resident with two drug convictions that qualify him for mandatory detention under §1226(c). Though he was released from criminal custody in 2006, immigration officials did not detain him until 2013, when he was released from jail after an arrest for another offense. His co-plaintiffs Juan Lozano Magdaleno and Eduardo Vega Padilla were taken into immigration detention, respectively, 5 and 11 years after their release from custody for a §1226(c) predicate

––––––––––

2006) (an alien was subject to mandatory detention based on a determination that the alien had solicited funds for a terrorist group).

offense. Preap, Magdaleno, and Padilla filed habeas petitions and a class-action complaint alleging that because they were not arrested "immediately" after release from criminal custody, they are exempt from mandatory detention under §1226(c) and are entitled to a bond hearing to determine if they should be released pending a decision on their status.

Although the named plaintiffs in *Preap* were not taken into custody on immigration grounds until years after their release from criminal custody, the District Court certified a broad class comprising all aliens in California "'who are or will be subjected to mandatory detention under 8 U. S. C. section 1226(c) and who were not or will not have been taken into custody by the government *immediately* upon their release from criminal custody for a [s]ection 1226(c)(1) offense.'" 831 F. 3d, at 1198 (emphasis added). The District Court granted a preliminary injunction against the mandatory detention of the members of this class, holding that criminal aliens are exempt from mandatory detention under §1226(c) (and are thus entitled to a bond hearing) unless they are arrested "'when [they are] released,' and no later." *Preap* v. *Johnson*, 303 F. R. D. 566, 577 (ND Cal. 2014) (quoting 8 U. S. C. §1226(c)(1)). The Court of Appeals for the Ninth Circuit affirmed.

*Khoury*, the other case now before us, involves habeas petitions and a class-action complaint filed in the Western District of Washington. The District Court certified a class comprising all aliens in that district "who were subjected to mandatory detention under 8 U. S. C. §1226(c) even though they were not detained immediately upon their release from criminal custody." 667 Fed. Appx., at 967. The District Court granted summary judgment for respondents, and the Ninth Circuit again affirmed, citing its decision on the same day in *Preap*.

Because *Preap* and *Khoury* created a split with four

other Courts of Appeals, we granted certiorari to review the Ninth Circuit's ruling that criminal aliens who are not arrested immediately upon release are thereby exempt from mandatory detention under §1226(c). 583 U. S. ___ (2018). We now reverse.

II

Before addressing the merits of the Court of Appeals' interpretation, we resolve four questions regarding our jurisdiction to hear these cases.

The first potential hurdle concerns §1226(e), which states:

> "The [Secretary's] *discretionary judgment* regarding the *application* of [§1226] shall not be subject to review. No court may set aside any action or decision by the [Secretary] under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." (Emphasis added.)

As we have held, this limitation applies only to "discretionary" decisions about the "application" of §1226 to particular cases. It does not block lawsuits over "the extent of the Government's detention authority under the 'statutory framework' as a whole." *Jennings* v. *Rodriguez*, 583 U. S. ___, ___–___ (2018) (slip op., at 11–12) (quoting *Demore*, 538 U. S., at 517). And the general extent of the Government's authority under §1226(c) is precisely the issue here. Respondents' argument is not that the Government exercised its statutory authority in an unreasonable fashion. Instead, they dispute the extent of the statutory authority that the Government claims. Because this claim of authority does not constitute a mere "discretionary" "application" of the relevant statute, our review is not barred by §1226(e).

Nor are we stripped of jurisdiction by §1252(b)(9), which provides:

"Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter [including §§1225 and 1226] shall be available only in judicial review of a final order under this section." (Emphasis added.)

As in *Jennings*, respondents here "are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal [as opposed to the decision to deny them bond hearings]; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances," we held in *Jennings*, see 583 U. S., at ___–___ (slip op., at 10–11), "§1252(b)(9) does not present a jurisdictional bar."

The Government raised a third concern before the District Court in *Preap*: that under 8 U. S. C. §1252(f )(1), that court lacked jurisdiction to enter the requested injunction. As §1252(f )(1) cautions:

"Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [§§1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."

Did the *Preap* court overstep this limit by granting injunctive relief for a class of aliens that includes some who have not yet faced—but merely "will face"—mandatory detention? The District Court said no, but we need not decide. Whether the *Preap* court had jurisdiction to enter such an injunction is irrelevant because the District Court had

jurisdiction to entertain the plaintiffs' request for declaratory relief, and for independent reasons given below, we are ordering the dissolution of the injunction that the District Court ordered.

Finally, and again before the *Preap* District Court, the Government raised a fourth potential snag: mootness. Class actions are "[n]ormally . . . moot if no named class representative with an unexpired claim remain[s] at the time of class certification." *United States* v. *Sanchez-Gomez*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 4). But that general norm is no hurdle here.

The suggestion of mootness in these cases was based on the fact that by the time of class certification the named plaintiffs had obtained either cancellation of removal or bond hearings. See 831 F. 3d, at 1197–1198; *Khoury* v. *Asher*, 3 F. Supp. 3d 877, 879–880 (WD Wash. 2014). But those developments did not make the cases moot because at least one named plaintiff in both cases had obtained release on bond, as opposed to cancellation of removal, and that release had been granted following a preliminary injunction in a separate case. Unless that preliminary injunction was made permanent and was not disturbed on appeal, these individuals faced the threat of re-arrest and mandatory detention. And indeed, we later ordered that that injunction be dissolved. See *Jennings*, 583 U. S., at \_\_\_ (slip op., at 31). Thus, in both cases, there was at least one named plaintiff with a live claim when the class was certified.

Even if that had not been so, these cases would not be moot because the fact that a class "was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction" when, as in these cases, the harms alleged are transitory enough to elude review. *County of Riverside* v. *McLaughlin*, 500 U. S. 44, 52 (1991) (affirming jurisdiction over a class action challenging a county's failure to provide "prompt" determinations of

probable cause for those subjected to warrantless arrest and detention). Respondents claim that they would be harmed by detention without a hearing pending a decision on their removal. Because this type of injury ends as soon as the decision on removal is made, it is transitory. So the fact that the named plaintiffs obtained some relief before class certification does not moot their claims.

## III

Having assured ourselves of our jurisdiction, we turn to the merits. Respondents contend that they are not properly subject to §1226(c)'s mandatory-detention scheme, but instead are entitled to the bond hearings available to those held under the general arrest and release authority provided in §1226(a). Respondents' primary textual argument turns on the interaction of paragraphs (1) and (2) of §1226(c). Recall that those paragraphs govern, respectively, the "[c]ustody" and "[r]elease" of criminal aliens guilty of a predicate offense. Paragraph (1) directs the Secretary to arrest any such alien "when the alien is released," and paragraph (2) forbids the Secretary to release any "alien described in paragraph (1)" pending a determination on removal (with one exception not relevant here). Because the parties' arguments about the meaning of §1226(c) require close attention to the statute's terms and structure, we reproduce the provision in full below. But only the portions of the statute that we have highlighted are directly relevant to respondents' argument. Section 1226(c) provides:

"(c) Detention of criminal aliens
    "(1) Custody
    "*The [Secretary] shall take into custody any alien who—*
    "(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
    "(B) is deportable by reason of having committed

any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

"(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

"(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

"*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

"(2) Release

"*The [Secretary] may release an alien described in paragraph (1) only if* the [Secretary] decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the [Secretary] that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." (Emphasis added.)

Respondents argue that they are not subject to mandatory detention because they are not "described in" §1226(c)(1), even though they (and all the other members of the classes they represent) fall into at least one of the

categories of aliens covered by subparagraphs (A)–(D) of
that provision.  An alien covered by these subparagraphs
is not "described in" §1226(c)(1), respondents contend,
unless the alien was also arrested "when [he or she was]
released" from criminal custody.  Indeed, respondents
insist that the alien must have been arrested *immediately*
after release.  Since they and the other class members
were not arrested immediately, respondents conclude,
they are not "described in" §1226(c)(1).  So to detain them,
the Government must rely not on §1226(c) but on the
general provisions of §1226(a).  And thus, like others
detained under §1226(a), they are owed bond hearings in
which they can earn their release by proving that they
pose no flight risk and no danger to others—or so they
claim.  But neither the statute's text nor its structure
supports this argument.  In fact, both cut the other way.

## A

First, respondents' position runs aground on the plain
text of §1226(c).  Respondents are right that only an alien
"described in paragraph (1)" faces mandatory detention,
but they are wrong about which aliens are "described in"
paragraph (1).

Paragraph (1) provides that the Secretary "shall take"
into custody any "alien" having certain characteristics and
that the Secretary must do this "when the alien is re-
leased" from criminal custody.  The critical parts of the
provision consist of a verb ("shall take"), an adverbial
clause ("when . . . released"), a noun ("alien"), and a series
of adjectival clauses ("who . . . is inadmissible," "who . . . is
deportable," etc.).  As an initial matter, no one can deny
that the adjectival clauses modify (and in that sense "de-
scrib[e]") the noun "alien" or that the adverbial clause
"when . . . released" modifies the verb "shall take."  And
since an adverb cannot modify a noun, the "when released"
clause cannot modify "alien."  Again, what modifies (and

in that sense "describe[s]") the noun "alien" are the adjectival clauses that appear in subparagraphs (A)–(D).

Respondents and the dissent contend that this grammatical point is not the end of the matter—that an adverb can "describe" a person even though it cannot modify the noun used to denote that person. See *post*, at 5–6 (opinion of BREYER, J.). But our interpretation is not dependent on a rule of grammar. The preliminary point about grammar merely complements what is critical, and indeed conclusive in these cases: the particular meaning of the term "described" as it appears in §1226(c)(2). As we noted in *Luna Torres* v. *Lynch*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 6), the term "'describe' takes on different meanings in different contexts." A leading definition of the term is "to communicate verbally . . . an account of salient *identifying* features," Webster's Third New International Dictionary 610 (1976), and that is clearly the meaning of the term used in the phrase "an alien *described* in paragraph (1)." (Emphasis added.) This is clear from the fact that the indisputable job of the "descri[ption] in paragraph (1)" is to "identif[y]" for the Secretary—to list the "salient . . . features" by which she can pick out—which aliens she must arrest immediately "when [they are] released."

And here is the crucial point: The "when . . . released" clause could not possibly describe aliens in that sense; it plays no role in identifying for the Secretary *which* aliens she must immediately arrest. If it did, the directive in §1226(c)(1) would be nonsense. It would be ridiculous to read paragraph (1) as saying: "The Secretary must arrest, upon their release from jail, a particular subset of criminal aliens. Which ones? Only those who are arrested upon their release from jail." Since it is the Secretary's action that *determines* who is arrested upon release, "being arrested upon release" cannot be one of her criteria in figuring out whom to arrest. So it cannot "describe"—it cannot give the Secretary an "identifying featur[e]" of—the rele-

vant class of aliens. On any other reading of paragraph
(1), the command that paragraph (1) gives the Secretary
would be downright incoherent.

Our reading is confirmed by Congress's use of the definite article in "when the alien is released." Because
"[w]ords are to be given the meaning that proper grammar
and usage would assign them," A. Scalia & B. Garner,
Reading Law: The Interpretation of Legal Texts 140
(2012), the "rules of grammar govern" statutory interpretation "unless they contradict legislative intent or purpose," *ibid.* (citing *Costello* v. *INS*, 376 U. S. 120, 122–126
(1964)). Here grammar and usage establish that "the" is
"a function word . . . indicat[ing] that a following noun or
noun equivalent is definite or has been previously specified by context." Merriam-Webster's Collegiate Dictionary
1294 (11th ed. 2005). See also *Work* v. *United States
ex rel. McAlester-Edwards Co.*, 262 U. S. 200, 208 (1923)
(Congress's "use of the definite article [in a reference to
"the appraisement"] means an appraisement specifically
provided for"). For "the alien"—in the clause "when the
alien is released"—to have been previously specified, its
scope must have been settled by the time the "when . . .
released" clause appears at the tail end of paragraph (1).

For these reasons, we hold that the scope of "the alien"
is fixed by the predicate offenses identified in subparagraphs (A)–(D).[5] And since only those subparagraphs
settle who is "described in paragraph (1)," anyone who fits
*their* description falls under paragraph (2)'s detention
mandate—even if (as with respondents) the Secretary did
not arrest them immediately "when" they were "released."

------

[5] For this reason, it is irrelevant that (as the dissent notes, see *post*,
at 8) paragraph (2) applies to aliens described in "paragraph (1)" and
not "subparagraphs (A)–(D)." These two phrases denote the same
category, so nothing can be gleaned from Congress's choice of one over
the other.

B

In reaching the contrary conclusion, the Ninth Circuit thought that the very structure of §1226 favors respondents' reading. In particular, the Ninth Circuit reasoned, each subsection's arrest and release provisions must work together. Thus, aliens must be arrested under the general arrest authority in subsection (a) in order to get a bond hearing under subsection (a)'s release provision. And in order to face mandatory detention under subsection (c), criminal aliens must have been arrested under subsection (c). But since subsection (c) authorizes only immediate arrest, the argument continues, those arrested later fall under subsection (a), not (c). Accordingly, the court concluded, those arrested well after release escape subsection (c)'s detention mandate. See 831 F. 3d, at 1201–1203. But this argument misreads the structure of §1226; and in any event, the Ninth Circuit's conclusion would not follow even if we granted all its premises about statutory structure.

1

Although the Ninth Circuit viewed subsections (a) and (c) as establishing separate sources of arrest and release authority, in fact subsection (c) is simply a limit on the authority conferred by subsection (a).

Recall that subsection (a) has two sentences that provide the Secretary with general discretion over the arrest and release of aliens, respectively. We read each of subsection (c)'s two provisions—paragraph (1) on arrest, and paragraph (2) on release—as modifying its counterpart sentence in subsection (a). In particular, subsection (a) creates authority for *anyone's* arrest or release under §1226—and it gives the Secretary broad discretion as to both actions—while subsection (c)'s job is to *subtract* some of that discretion when it comes to the arrest and release of criminal aliens. Thus, subsection (c)(1) limits subsection (a)'s first sentence by curbing the discretion to arrest:

The Secretary *must* arrest those aliens guilty of a predicate offense. And subsection (c)(2) limits subsection (a)'s second sentence by cutting back the Secretary's discretion over the decision to release: The Secretary may *not* release aliens "described in" subsection (c)(1)—that is, those guilty of a predicate offense. Accordingly, all the relevant detainees will have been arrested by authority that springs from subsection (a), and so, contrary to the Court of Appeals' view, that fact alone will not spare them from subsection (c)(2)'s prohibition on release. This reading comports with the Government's practice of applying to the arrests of all criminal aliens certain procedural requirements, such as the need for a warrant, that appear only in subsection (a). See Tr. of Oral Arg. 13–14.

The text of §1226 itself contemplates that aliens arrested under subsection (a) may face mandatory detention under subsection (c). The second sentence in subsection (a)—which generally authorizes the Secretary to *release* an alien pending removal proceedings—features an exception "as provided in subsection (c)." But if the Court of Appeals were right that subsection (c)(2)'s prohibition on release applies only to those arrested pursuant to subsection (c)(1), there would have been no need to specify that such aliens are exempt from subsection *(a)*'s release provision. This shows that it is possible for those arrested under subsection (a) to face mandatory detention under subsection (c). We draw a similar inference from the fact that subsection (c)(2), for its part, does not limit mandatory detention to those arrested "pursuant to" subsection (c)(1) or "under authority created by" subsection (c)(1)—but to anyone so much as "described in" subsection (c)(1). This choice of words marks a contrast with Congress's reference—in the immediately preceding subsection—to actions by the Secretary that are "authorized under" subsection (a). See §1226(b). Cf. 18 U. S. C. §3262(b) (referring to "a person *arrested under* subsection (a)" (emphasis

added)). These textual cues indicate that even if an alien was not arrested under authority bestowed by subsection (c)(1), he may face mandatory detention under subsection (c)(2).

2

But even if the Court of Appeals were right to reject this reading, the result below would be wrong. To see why, assume with the Court of Appeals that only someone arrested under authority created by §1226(c)(1)—rather than the more general §1226(a)—may be detained without a bond hearing. And assume that subsection (c)(1) requires *immediate* arrest. Even then, the Secretary's failure to abide by this time limit would not cut off her power to arrest under subsection (c)(1). That is so because, as we have held time and again, an official's crucial duties are better carried out late than never. See *Sylvain* v. *Attorney General of U. S.*, 714 F. 3d 150, 158 (CA3 2013) (collecting cases). Or more precisely, a statutory rule that officials "'shall' act within a specified time" does not by itself "preclud[e] action later." *Barnhart* v. *Peabody Coal Co.*, 537 U. S. 149, 158 (2003).

Especially relevant here is our decision in *United States* v. *Montalvo-Murillo*, 495 U. S. 711 (1990). There we held that "a provision that a detention hearing 'shall be held immediately upon the [detainee's] first appearance before the judicial officer' did not bar detention after a tardy hearing." *Barnhart*, 537 U. S., at 159 (quoting *Montalvo-Murillo*, 495 U. S., at 714). In that case, we refused to "bestow upon the defendant a windfall" and "visit upon the Government and the citizens a severe penalty by mandating release of possibly dangerous defendants every time some deviation from the [statutory] strictures . . . occur[red]." *Montalvo-Murillo*, 495 U. S., at 720. Instead, we gave effect to the principle that "'if a statute does not specify a consequence for noncompliance with statutory

timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction.'" *Barnhart*, 537 U. S., at 159 (quoting *United States* v. *James Daniel Good Real Property*, 510 U. S. 43, 63 (1993)).

This principle for interpreting time limits on statutory mandates was a fixture of the legal backdrop when Congress enacted §1226(c). Cf. *Woodford* v. *Garceau*, 538 U. S. 202, 209 (2003) (relying on the "legal backdrop" against which "Congress legislated" to clarify what Congress enacted). Indeed, we have held of a statute enacted just four years before §1226(c) that because of our case law at the time—never since abrogated—Congress was "presumably aware that we do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time." *Barnhart*, 537 U. S., at 160 (relying on *Brock* v. *Pierce County*, 476 U. S. 253 (1986)). Here this principle entails that even if subsection (c)(1) were the sole source of authority to arrest aliens without granting them hearings, that authority would not evaporate just because officials had transgressed subsection (c)(1)'s command to arrest aliens immediately "when . . . released."

Respondents object that the rule invoked in *Montalvo-Murillo* and related cases does not apply here. In those cases, respondents argue, the governmental authority at issue would have disappeared entirely if time limits were enforced—whereas here the Secretary could still arrest aliens well after their release under the general language in §1226(a).

But the whole premise of respondents' argument is that if the Secretary could no longer act under §1226(c), she *would* lose a specific power—the power to arrest and detain criminal aliens without a bond hearing. If that is so, then as in other cases, accepting respondents' deadline-based argument would be inconsistent with "the design and function of the statute." *Montalvo-Murillo*, 495 U. S.,

at 719. From Congress's perspective, after all, it is irrelevant that the Secretary could go on detaining criminal aliens subject to a bond hearing. Congress enacted mandatory detention precisely out of concern that such individualized hearings could not be trusted to reveal which "deportable criminal aliens who are not detained" might "continue to engage in crime [or] fail to appear for their removal hearings." *Demore*, 538 U. S., at 513. And having thus required the Secretary to impose mandatory detention without bond hearings immediately, for safety's sake, Congress could not have meant for judges to "enforce" this duty in case of delay by—of all things—forbidding its execution. Cf. *Montalvo-Murillo*, 495 U. S., at 720 ("The end of exacting compliance with the letter" of the Bail Reform Act's requirement that a defendant receive a hearing immediately upon his first appearance before a judicial officer "cannot justify the means of exposing the public to an increased likelihood of violent crimes by persons on bail, an evil the statute aims to prevent").

Especially hard to swallow is respondents' insistence that for an alien to be subject to mandatory detention under §1226(c), the alien must be arrested on the day he walks out of jail (though respondents allow that it need not be at the jailhouse door—the "parking lot" or "bus stop" would do). Tr. of Oral Arg. 44. "Assessing the situation in realistic and practical terms, it is inevitable that" respondents' unsparing deadline will often be missed for reasons beyond the Federal Government's control. *Montalvo-Murillo*, 495 U. S., at 720. Cf. *Regions Hospital* v. *Shalala*, 522 U. S. 448, 459, n. 3 (1998) ("The Secretary's failure to meet the deadline, a not uncommon occurrence when heavy loads are thrust on administrators, does not mean that [she] lacked power to act beyond it"). To give just one example, state and local officials sometimes rebuff the Government's request that they give notice when a criminal alien will be released. Indeed, over a

span of less than three years (from January 2014 to Sep-
tember 2016), the Government recorded "a total of 21,205
declined [requests] in 567 counties in 48 states including
the District of Columbia." ICE, Fiscal Year 2016 ICE Enf.
and Removal Operations Rep. 9. Nor was such local re-
sistance unheard of when Congress enacted the language
of §1226(c) in 1996. See S. Rep. No. 104–48, p. 28 (1995).
Under these circumstances, it is hard to believe that Con-
gress made the Secretary's mandatory-detention authority
vanish at the stroke of midnight after an alien's release.

In short, the import of our case law is clear: Even if
subsection (c) were the only font of authority to detain
aliens without bond hearings, we could not read its "when
. . . released" clause to defeat officials' duty to impose such
mandatory detention when it comes to aliens who are
arrested well after their release.

### IV

Respondents protest that reading §1226(c) in the man-
ner set forth here would render key language superfluous,
lead to anomalies, and violate the canon of constitutional
avoidance. We answer these objections in turn.

### A

According to respondents, the Government's reading of
§1226(c) flouts the interpretive canon against surplus-
age—the idea that "every word and every provision is to be
given effect [and that n]one should needlessly be given an
interpretation that causes it to duplicate another provision
or to have no consequence." Scalia, Reading Law, at 174.
See *Kungys* v. *United States*, 485 U. S. 759, 778 (1988)
(plurality opinion of Scalia, J.) (citing the "cardinal rule of
statutory interpretation that no provision should be con-
strued to be entirely redundant"). Respondents' surplus-
age argument has two focal points.

First, respondents claim that if they face mandatory

detention even though they were arrested well after their release, then "when . . . released" adds nothing to paragraph (1). In fact, however, it still has work to do. For one thing, it clarifies when the duty to arrest is triggered: upon release from criminal custody, not before such release or after the completion of noncustodial portions of a criminal sentence (such as a term of "parole, supervised release, or probation," as the paragraph goes on to emphasize). Thus, paragraph (1) does not permit the Secretary to cut short an alien's state prison sentence in order to usher him more easily right into immigration detention— much as another provision prevents officials from actually removing an alien from the country "until the alien is released from imprisonment." 8 U. S. C. §1231(a)(4)(A). And from the other end, as paragraph (1)'s language makes clear, the Secretary need not wait for the sentencing court's supervision over the alien to expire.

The "when . . . released" clause also serves another purpose: exhorting the Secretary to act quickly. And this point answers respondents' second surplusage claim: that the "Transition Period Custody Rules" enacted along with §1226(c) would have been superfluous if §1226(c) did not call for immediate arrests, since those rules authorized delays in §1226(c)'s implementation while the Government expanded its capacities. See *Matter of Garvin-Noble*, 21 I. & N. Dec. 672, 675 (BIA 1997). This argument again confuses what the Secretary is obligated to do with the consequences that follow if the Secretary fails (for whatever reason) to fulfill that obligation. The transition rules delayed the onset of the Secretary's obligation to begin making arrests as soon as covered aliens were released from criminal custody, and in that sense they were not superfluous.[6] This is so even though, had the transition

——————

[6] The dissent asks *why* Congress would have felt the need to provide for a delay if it thought that either way, the Secretary would get to

rules not been adopted, the Secretary's failure to make an arrest immediately upon a covered alien's release would not have exempted the alien from mandatory detention under §1226(c).

B

The Court of Appeals objected that the Government's reading of §1226(c) would have the bizarre result that some aliens whom the Secretary need not arrest at all must nonetheless be detained without a hearing if they *are* arrested. 831 F. 3d, at 1201–1203. This rather complicated argument, as we understand it, proceeds as follows. Paragraph (2) requires the detention of aliens "described in paragraph (1)." While most of the aliens described there have been convicted of a criminal offense, this need not be true of aliens captured by subparagraph (D) in particular—which covers, for example, aliens who are close relatives of terrorists and those who are believed likely to commit a terrorist act. See §1182(a)(3)(B)(i)(IX). But if, as the Government maintains, *any* alien who falls under subparagraphs (A)–(D) is thereby ineligible for release from immigration custody, then the Secretary would be forbidden to release even these aliens who were

———————

deny a hearing to aliens arrested well after release. *Post*, at 10; see also *post*, at 13–14. The answer is that Congress does not draft legislation *in the expectation* that the Executive will blow through the deadlines it sets. That is why Congress specifies any deadlines for executive duties at all; and here it explains why Congress furthermore provided that the deadline it set for this particular duty (to arrest criminal aliens *upon their release*) would not take effect right away.

In fact, if the dissent's argument from the transition rules were sound—*i.e.*, if textual evidence that Congress *expects* the Executive to meet a deadline (once it officially takes effect) were proof that Congress wanted the deadline *enforced by courts*—then every case involving an express statutory deadline would be one in which Congress intended for courts to enforce the deadline. But this would include, by definition, all of the loss-of-authority cases we discussed above, see Part III–B–2, *supra*—a long line of precedent that the dissent does not question.

never convicted or perhaps even charged with a crime, once she arrested them. Yet she would be free not to arrest them to begin with (or so the Court of Appeals assumed), since she is obligated to arrest aliens "when . . . released," and there was no prior custody for *these* aliens to be "released" *from*. Therefore, the court concluded, the Government's position has the absurd implication that aliens who were never charged with a crime need not be arrested pending a removal determination, but if they *are* arrested, they must be detained and cannot be released on bond or parole.

We agree that it would be very strange for Congress to forbid the release of aliens who need not be arrested in the first place, but the fact is that the Government's reading (and ours) does not have that incongruous result. The real anomalies here would flow instead from the Court of Appeals' interpretation.

To begin with the latter point: Under the Court of Appeals' reading, the mandatory-detention scheme would be gentler on terrorists than it is on garden-variety offenders. To see why, recall first that subparagraphs (A)–(C) cover aliens who are inadmissible or deportable based on the commission of certain criminal offenses, and there is no dispute that the statute authorizes their mandatory detention when they are released from criminal custody. And the crimes covered by these subparagraphs include, for example, any drug offense by an adult punishable by more than one year of imprisonment, see §§1182(a)(2), 1226(c)(1)(A), as well as a variety of tax offenses, see §§1226(c)(1)(B), 1227(a)(2)(A)(iii); *Kawashima* v. *Holder*, 565 U. S. 478 (2012). But notice that aliens who fall within subparagraph (D), by contrast, may never have been arrested on criminal charges—which according to the court below would exempt them from mandatory detention. Yet this subparagraph covers the very sort of aliens for which Congress was most likely to have wanted to

require mandatory detention—including those who are representatives of a terrorist group and those whom the Government has reasonable grounds to believe are likely to engage in terrorist activities. See §§1182(a)(3)(B)(i)(III), (IV), 1226(c)(1)(D).[7] Thus, by the Court of Appeals' logic, Congress chose to spare terrorist aliens from the rigors of mandatory detention—a mercy withheld from almost all drug offenders and tax cheats. See Brief for National Immigrant Justice Center as *Amicus Curiae* 7–8. *That* result would be incongruous.

Along similar lines, note that one §1226(c)(1) predicate reaches aliens who necessarily escape conviction: those "for whom immunity from criminal jurisdiction was exercised." §1182(a)(2)(E)(ii). See §1226(c)(1)(A). And other predicates sweep in aliens whom there is no reason to expect police (as opposed to immigration officials) will have reason to arrest: *e.g.*, the "spouse or child of an alien" who recently engaged in terrorist activity. §1182(a)(3)(B)(i)(IX); see §1226(c)(1)(D). It would be pointless for Congress to have covered such aliens in subsections (c)(1)(A)–(D) if subsection (c)'s mandates applied only to those emerging from jail.

Thus, contrary to the Court of Appeals' interpretation of the "when released" clause as limiting the class of aliens subject to mandatory detention, we read subsection (c)(1) to specify the timing of arrest ("when the alien is released") only for the vast majority of cases: those involving criminal aliens who were once in criminal custody. The paragraph simply does not speak to the timeline for arresting the few who had no stint in jail. (And why should

_____

[7] In *Alafyouny*, 2006 WL 1581959, for example, an alien subject to mandatory detention had not been charged with any crime. Rather, in a hearing to consider his application for adjustment of status, an immigration judge found that the alien had engaged in terrorism-related activity identified in §1182(a)(3)(B)(iv)(IV)(cc), which qualified him for mandatory detention under §1226(c)(1)(D). *Id.*, at *3, *24.

it? Presumably they—unlike those serving time—are to be detained as they come across the Government's radar and any relevant evidentiary standards are satisfied.[8])

In short, we read the "when released" directive to apply when there is a release. In other situations, it is simply not relevant. It follows that both of subsection (c)'s mandates—for arrest and for release—apply to any alien linked with a predicate offense identified in subparagraphs (A)–(D), regardless of exactly when or even whether the alien was released from criminal custody.

C

Finally, respondents perch their reading of §1226(c)— unsteadily, as it turns out—on the canon of constitutional avoidance. This canon provides that "[w]hen 'a serious doubt' is raised about the constitutionality of an act of Congress, '. . . this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Jennings*, 583 U. S., at \_\_\_ (slip op., at 12) (quoting *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932)).

Respondents say we should be uneasy about endorsing any reading of §1226(c) that would mandate arrest and detention years after aliens' release from criminal custody—when many aliens will have developed strong ties to the country and a good chance of being allowed to stay if given a hearing. At that point, respondents argue, mandatory detention may be insufficiently linked to public benefits like protecting others against crime and ensuring that aliens will appear at their removal proceedings. In respondents' view, detention in that scenario would raise

———————

[8] See n. 7, *supra*. Detainees who deny that they satisfy any §1226(c) predicate may challenge their mandatory detention in a *Joseph* hearing. See *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). See also *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_, n. 1 (2018) (slip op., at 5, n. 1).

constitutional doubts under *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), which held that detention violates due process absent "adequate procedural protections" or "special justification[s]" sufficient to outweigh one's "'constitutionally protected interest in avoiding physical restraint,'" *id.*, at 690 (quoting *Kansas* v. *Hendricks*, 521 U. S. 346, 356 (1997)). Thus, respondents urge, we should adopt a reading of §1226(c)—their reading—that avoids this result.

The trouble with this argument is that constitutional avoidance "'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings*, 583 U. S., at ___ (slip op., at 12). The canon "has no application" absent "ambiguity." *Warger* v. *Shauers*, 574 U. S. 40, 50 (2014) (internal quotation marks omitted). See also *Zadvydas*, 533 U. S., at 696 ("Despite this constitutional problem, if Congress has made its intent in the statute clear, we must give effect to that intent" (internal quotation marks omitted)). Here the text of §1226 cuts clearly against respondents' position, see Part III, *supra*, making constitutional avoidance irrelevant.

We emphasize that respondents' arguments here have all been statutory. Even their constitutional concerns are offered as just another pillar in an argument for their preferred reading of the language of §1226(c)—an idle pillar here because the statute is clear. While respondents might have raised a head-on constitutional challenge to §1226(c), they did not. Our decision today on the meaning of that statutory provision does not foreclose as-applied challenges—that is, constitutional challenges to applications of the statute as we have now read it.

*          *          *

The judgments of the Court of Appeals for the Ninth Circuit are reversed, and the cases are remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 16–1363

———————

## KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* MONY PREAP, ET AL.

## BRYAN WILCOX, ACTING FIELD OFFICE DIRECTOR, IMMIGRATION AND CUSTOMS ENFORCEMENT, ET AL., PETITIONERS *v.* BASSAM YUSUF KHOURY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 19, 2019]

JUSTICE KAVANAUGH, concurring.

I write separately to emphasize the narrowness of the issue before us and, in particular, to emphasize what this case is *not* about.

This case is not about whether a noncitizen may be *removed* from the United States on the basis of criminal offenses. Under longstanding federal statutes, the Executive Branch may remove noncitizens from the United States when the noncitizens have been convicted of certain crimes, even when the crimes were committed many years ago.

This case is also not about whether a noncitizen may be *detained* during removal proceedings or before removal. Congress has expressly authorized the Executive Branch to detain noncitizens during their removal proceedings and before removal. 8 U. S. C. §§1226(a), (c), and 1231(a).

This case is also not about *how long* a noncitizen may be detained during removal proceedings or before removal. We have addressed that question in cases such as *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), *Clark* v. *Mar-*

*tinez*, 543 U. S. 371 (2005), and *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_ (2018).

This case is also not about whether Congress may *mandate* that the Executive Branch detain noncitizens during removal proceedings or before removal, as opposed to merely giving the Executive Branch discretion to detain. It is undisputed that Congress may mandate that the Executive Branch detain certain noncitizens during removal proceedings or before removal. Congress has in fact mandated detention of certain noncitizens who have been in criminal custody and who, upon their release, would pose a danger to the community or risk of flight. As relevant here, Congress has mandated detention "when" such noncitizens are "released" from criminal custody. 8 U. S. C. §1226(c)(1).

The sole question before us is narrow: whether, under §1226, the Executive Branch's mandatory duty to detain a particular noncitizen when the noncitizen is released from criminal custody remains mandatory if the Executive Branch fails to *immediately* detain the noncitizen when the noncitizen is released from criminal custody—for example, if the Executive Branch fails to immediately detain the noncitizen because of resource constraints or because the Executive Branch cannot immediately locate and apprehend the individual in question. No constitutional issue is presented. The issue before us is entirely statutory and requires our interpretation of the strict 1996 illegal-immigration law passed by Congress and signed by President Clinton. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–546.

It would be odd, in my view, if the Act (1) mandated detention of particular noncitizens because the noncitizens posed such a serious risk of danger or flight that they *must* be detained during their removal proceedings, but (2) nonetheless allowed the noncitizens to remain free during their removal proceedings if the Executive Branch failed

KAVANAUGH, J., concurring

to *immediately* detain them upon their release from criminal custody. Not surprisingly, the Act does not require such an odd result. On the contrary, the relevant text of the Act is relatively straightforward, as the Court explains. Interpreting that text, the Court correctly holds that the Executive Branch's detention of the particular noncitizens here remained mandatory even though the Executive Branch did not immediately detain them. I agree with the Court's careful statutory analysis, and I join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1363

_____

## KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* MONY PREAP, ET AL.

## BRYAN WILCOX, ACTING FIELD OFFICE DIRECTOR, IMMIGRATION AND CUSTOMS ENFORCEMENT, ET AL., PETITIONERS *v.* BASSAM YUSUF KHOURY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 19, 2019]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring in part and concurring in the judgment.

I continue to believe that no court has jurisdiction to decide questions concerning the detention of aliens before final orders of removal have been entered. See *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 1–11). By my count, Congress has erected at least three barriers to our review of the merits, and I also question whether Article III jurisdiction existed at the time of class certification. Nonetheless, because the Court has held that we have jurisdiction in cases like these, and because I largely agree with the Court's resolution of the merits, I join all but Parts II and III–B–2 of the Court's opinion.

I

Respondents consist of two classes of aliens who committed criminal offenses that require the Secretary of Homeland Security to detain them without a bond hearing

under 8 U. S. C. §1226(c), but who were not detained immediately upon release from criminal custody. Respondents argued that, by failing to immediately detain them, the Secretary lost the authority to deny them a bond hearing when they were rearrested.

The first class action was brought in the Northern District of California and has three class representatives. One of the plaintiffs, Mony Preap, received cancellation of removal and was not in immigration custody at the time of certification. The other two, Eduardo Vega Padilla and Juan Lozano Magdaleno, had received bond hearings as required by a Ninth Circuit decision, *Rodriguez* v. *Robbins*, 715 F. 3d 1127, 1138 (2013); Padilla had been released, while Magdaleno was denied release. The District Court certified a class of all aliens in California who are or will be subjected to mandatory detention under §1226(c) and who were not or will not have been taken into custody by the Government immediately upon their release from criminal custody for a §1226(c)(1) offense. The court issued a preliminary injunction requiring the Government to provide all class members with bond hearings under §1226(a).

The second class action was brought in the Western District of Washington and also has three class representatives: Bassam Yusuf Khoury and Alvin Rodriguez Moya, who had been released on bond before class certification after their *Rodriguez* hearings, and Pablo Carrera Zavala, who was released before class certification because the Department of Homeland Security determined that he had not committed a predicate §1226(c)(1) offense. The District Court certified a class of all aliens in its judicial district who were not detained immediately upon their release from criminal custody but were subjected to mandatory detention under §1226(c). The court entered a declaratory judgment barring the Government from subjecting class members to detention under §1226(c) unless

it took the alien into custody immediately upon release.

## II

At least three statutory provisions limit judicial review here, and I am skeptical whether the District Courts had Article III jurisdiction to certify the classes.

### A

First, §1252(b)(9) bars judicial review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States," except for review of "a final order" or other circumstances not present here. These cases raise questions of law or fact arising from removal proceedings—"[d]etention is necessarily a part of [the] deportation procedure" that culminates in the removal of the alien, *Carlson* v. *Landon*, 342 U. S. 524, 538 (1952)—and they do not come to us on review of final orders of removal. Thus, for the reasons I set forth in *Jennings*, *supra*, at \_\_\_–\_\_\_ (slip op., at 1–11), no court has jurisdiction over these class actions.

### B

Second, §1226(e) provides that "[n]o court may set aside any action or decision by the [Secretary] under this section regarding the detention or release of any alien or the grant, revocation, or *denial of bond* or parole." (Emphasis added.) This provision "unequivocally deprives federal courts of jurisdiction to set aside 'any action or decision' by the [Secretary]" regarding detention, discretionary or otherwise. *Demore* v. *Kim*, 538 U. S. 510, 533 (2003) (O'Connor, J., concurring in part and concurring in judgment); see *Jennings*, *supra*, at \_\_\_, n. 6 (slip op., at 11, n. 6). The Court once again reads this language as permitting judicial review for challenges to the "statutory framework as a whole." *Ante*, at 7 (internal quotation

marks omitted).   But the text of the statute contains no such exception.   Accordingly, I continue to think that no court has jurisdiction over these kinds of actions.

C

Third, §1252(f)(1) deprives district courts of "jurisdiction or authority to enjoin or restrain the operation of [§§1221–1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under [§§1221–1232] have been initiated." The text of §1252(f)(1) explicitly prohibits the classwide injunctive relief ordered by the Northern District of California in this instance, given that the class includes future, yet-to-be detained aliens against whom proceedings have not been initiated.   See *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 481 (1999) (explaining that §1252(f)(1) "prohibits federal courts from granting classwide injunctive relief against the operation of §§1221–1231").   The District Court relied on *Rodriguez* v. *Hayes*, 591 F. 3d 1105 (CA9 2010), which held that this provision does not affect authority to enjoin alleged violations of the specified statutes because those claims do not "seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct . . . not authorized by the statutes."   *Id.*, at 1120.   This reasoning is circular and unpersuasive.   Many claims seeking to enjoin or restrain the operation of the relevant statutes will allege that the Executive's action does not comply with the statutory grant of authority, but the text clearly bars jurisdiction to enter an injunction "[r]egardless of the nature of the action or claim."   Although the Court avoids deciding whether §1252(f)(1) prevented the District Court's injunction here, *ante*, at 8, I would hold that it did.

D

Finally, I harbor two concerns about whether the class

actions were moot at the time of certification. First, as the Court recognizes, class actions are ordinarily "moot if no named class representative with an unexpired claim remain[s] at the time of class certification." *United States* v. *Sanchez-Gomez*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 4); *ante*, at 9. At the time of class certification, all six of the named plaintiffs had received bond hearings or cancellation of removal. As I understand the plaintiffs' arguments, that was the full relief that they sought: "individualized bond hearings where they may attempt to prove that their release would not create a risk of flight or danger to the public." Motion for Class Certification in *Preap* v. *Beers*, No. 4:13–cv–5754 (ND Cal.), Doc. 8, p. 8; see Complaint for Injunctive and Declaratory Relief in *Preap*, *supra*, Doc. 1, p. 3 (seeking "immediate individualized bond hearings"); First Amended Class Action Complaint in *Khoury* v. *Asher*, No. 2:13–cv–1367 (WD Wash.), Doc. 19, p. 13 (requesting relief of "individualized bond hearings to all Plaintiffs"). The Court concludes that some of the named plaintiffs still faced the threat of rearrest and mandatory detention at the time of class certification because the bond hearings that they received were provided as part of a preliminary injunction in a separate case that was later dissolved. But whether the plaintiffs actually faced that threat has not been addressed by the parties, and I question whether this future contingency was sufficiently imminent to support Article III jurisdiction.

If the threat of rearrest and mandatory detention was too speculative to support jurisdiction, I disagree with the Court that our jurisdiction would be saved by our precedent on transitory claims. *Ante*, at 9–10. We have held that a court has Article III jurisdiction to certify a class action when the named plaintiffs' claims have become moot if the claim is "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's

individual interest expires." *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 399 (1980). The "inherently transitory" exception is measured from the time that the complaint is filed to the court's ruling on the motion for class certification. See *Genesis HealthCare Corp.* v. *Symczyk*, 569 U. S. 66, 75–77 (2013). In other words, the named plaintiff's standing in a class action need not exist throughout the lifecycle of the entire lawsuit. Here, Members of the Court have recognized that aliens are held, on average, for one year, and sometimes longer. See *Jennings*, 583 U. S., at ___ (BREYER, J., dissenting) (slip op., at 3) (noting that detention for aliens is "often lengthy," sometimes lasting years). I am not persuaded that the plaintiffs' claims are so "inherently transitory" as to preclude a ruling on class certification, especially since both District Courts certified the classes here within a year of the filing of the complaints. Cf. *County of Riverside* v. *McLaughlin*, 500 U. S. 44, 47, 52 (1991) (finding jurisdiction over a class action that challenged a county's failure to provide "prompt" probable-cause hearings within the 48-hour window for arraignments, as required by state law).

\* \* \*

Because three statutes deprive courts of jurisdiction over respondents' claims, I would have vacated the judgments below and remanded with instructions to dismiss the cases for lack of jurisdiction. But because the Court has held otherwise and I agree with the Court's disposition of the merits, I concur in all but Parts II and III–B–2 of its opinion.

# SUPREME COURT OF THE UNITED STATES

---

No. 16–1363

---

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS *v.*
MONY PREAP, ET AL.

BRYAN WILCOX, ACTING FIELD OFFICE DIRECTOR,
IMMIGRATION AND CUSTOMS ENFORCEMENT,
ET AL., PETITIONERS *v.* BASSAM YUSUF
KHOURY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[March 19, 2019]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

A provision of the Immigration and Nationality Act, 8 U. S. C. §1226(c), focuses upon potentially deportable noncitizens who have committed certain offenses or have ties to terrorism. It requires the Secretary of Homeland Security to take those aliens into custody "when . . . released" from prison and to hold them *without a bail hearing* until Government authorities decide whether to deport them. The question is whether this provision limits the class of persons in the "no-bail-hearing" category to only those aliens who were taken into custody "when . . . released" from prison, or whether it also places in that "no-bail-hearing" category those aliens who were taken into custody years or decades after their release from prison.

The critical statutory language is contained in paragraph (2) of this provision. That paragraph says (with one exception not relevant here) that "an alien described in paragraph (1)" must be held without a bail hearing. Here we must decide what these words mean. Do the words "an

alien described in paragraph (1)" refer only to those aliens whom the Secretary, following paragraph (1)'s instructions, has "take[n] into custody . . . when the alien is released" from, say, state or federal prison? Or do these words refer instead to *all* aliens who have *ever* committed one of the offenses listed in paragraph (1), regardless of when these aliens were "released" from prison?

For present purposes, I accept the Court's holding in *Jennings* v. *Rodriguez*, 583 U. S. ___ (2018), that paragraph (2) forbids bail hearings for aliens "described in paragraph (1)." But see *id.*, at ___ (BREYER, J., dissenting) (slip op., at 2) (interpreting paragraph (2) as not forbidding bail hearings, as the Constitution likely requires them); *id.*, at ___ (majority opinion) (slip op., at 29) (declining to reach constitutional question). Here, however, the Court goes much further. The majority concludes that paragraph (2) forbids bail hearings for aliens regardless of whether they are taken into custody "when . . . released" from prison. Under the majority's view, the statute forbids bail hearings even for aliens whom the Secretary has detained years or decades after their release from prison.

The language of the statute will not bear the broad interpretation the majority now adopts. Rather, the ordinary meaning of the statute's language, the statute's structure, and relevant canons of interpretation all argue convincingly to the contrary. I respectfully dissent.

## I

### A

The relevant statute, 8 U. S. C. §1226, is entitled "Apprehension and detention of aliens." See Appendix A, *infra*. Its first subsection, subsection (a), is entitled "Arrest, detention, and release." Subsection (a) sets forth the background rule. It gives the Secretary of Homeland Security (formerly the Attorney General) the authority to "arres[t] and detai[n]" an "alien . . . pending a decision on

whether the alien is to be removed from the United States." §1226(a). See *ante,* at 3, n. 2. It adds that the Secretary "may release the alien" on "bond" or "conditional parole." §1226(a)(2). Federal regulations provide that a person detained under this subsection must receive a bail hearing. 8 CFR §§236.1(d)(1), 1236.1(d)(1) (2018). With respect to release, however, subsection (a) adds the words "[e]xcept as provided in subsection (c)." 8 U. S. C. §1226(a).

The subsection containing the exception to which (a) refers—namely, subsection (c)—is entitled "Detention of criminal aliens." It consists of two paragraphs.

Paragraph (1), entitled "Custody," says that the Secretary "shall take into custody any alien who" is "inadmissible" or "deportable" (by reason of having committed certain offenses or having ties to terrorism) "*when the alien is released,*" presumably from local, state, or federal criminal custody. §1226(c)(1) (emphasis added). Because the relevant offenses are listed in four subparagraphs headed by the letters "A," "B," "C," and "D," I shall refer to the relevant aliens as "ABCD" aliens. Thus, for present purposes, paragraph (1) says that the Secretary "shall take into custody any" ABCD alien "when the alien is released" from criminal custody.

Paragraph (2), entitled "Release," says that the Secretary "may release *an alien described in paragraph (1)* only if" the alien falls within a special category—not relevant here—related to witness protection. §1226(c)(2) (emphasis added). We held last Term in *Jennings* that paragraph (2) forbids a bail hearing for "an alien described in paragraph (1)" unless the witness protection exception applies. 583 U. S., at \_\_\_–\_\_\_ (majority opinion) (slip op., at 20–22).

Here we focus on the meaning of a key phrase in paragraph (2): "an alien described in paragraph (1)." This is the phrase that identifies the aliens to whom paragraph (2) (and its "no-bail-hearing" requirement) applies. Does

paragraph (1) "describ[e]" *all* ABCD aliens, even those whom the Secretary has "take[n] into custody" many years after their release from prison?  Or does it "describ[e]" only those aliens whom the Secretary has "take[n] into custody . . . when the alien [was] released" from prison?

### B

The issue may sound technical.  But it is extremely important.  That is because the Government's reading of the statute—namely, that paragraph (2) forbids bail hearings for all ABCD aliens regardless of whether they were detained "when . . . released" from criminal custody— would significantly expand the Secretary's authority to deny bail hearings.  Under the Government's view, the aliens subject to detention without a bail hearing may have been released from criminal custody years earlier, and may have established families and put down roots in a community.  These aliens may then be detained for months, sometimes years, without the possibility of release; they may have been convicted of only minor crimes—for example, minor drug offenses, or crimes of "moral turpitude" such as illegally downloading music or possessing stolen bus transfers; and they sometimes may be innocent spouses or children of a suspect person.  Moreover, for a high percentage of them, it will turn out after months of custody that they will not be removed from the country because they are eligible by statute to receive a form of relief from removal such as cancellation of removal.  These are not mere hypotheticals.  See Appendix B, *infra*.  Thus, in terms of potential consequences and basic American legal traditions, see *infra*, at 11–12, the question before us is not a "narrow" one, *ante,* at 2 (KAVANAUGH, J., concurring).

Why would Congress have granted the Secretary such broad authority to deny bail hearings, especially when doing so would run contrary to basic American and

common-law traditions? See *Jennings*, *supra,* at \_\_\_–\_\_\_ (BREYER, J., dissenting) (slip op., at 8–10). The answer is that Congress did not do so. Ordinary tools of statutory interpretation demonstrate that the authority Congress granted to the Secretary is far more limited.

## II

The statute's language, its structure, and relevant canons of interpretation make clear that the Secretary cannot hold an alien without a bail hearing unless the alien is "take[n] into custody . . . when the alien is released" from criminal custody. §1226(c)(1).

## A

Consider the statute's language. Paragraph (1) of subsection (c) provides that the Secretary "shall take into custody" any ABCD alien—that is, any alien who is "inadmissible" or "deportable" under the subparagraphs labeled "A," "B," "C," and "D"—"when the alien is released" from, say, state or federal prison. *Ibid.* Paragraph (2), meanwhile, generally forbids a bail hearing for "an alien described in paragraph (1)." §1226(c)(2).

The key phrase in paragraph (2) is "an alien *described* in paragraph (1)." As a matter of ordinary meaning and usage, the words "take into custody . . . when the alien is released" in paragraph (1) form part of the *description* of the "alien": An "alien described in paragraph (1)" is an ABCD alien whom the Secretary has "take[n] into custody . . . when the alien is released" from prison.

The majority emphasizes a grammatical point—namely, that ordinarily only adjectives or adjectival phrases "modify" nouns. *Ante*, at 12. But the statute does not use the word "modify." It uses the word "described." While the word "describe" will in some contexts refer only to the words that directly "modify" a noun, normally it has a broader meaning. Compare American Heritage Dictionary 490

(5th ed. 2011) (to "describe" is to "convey an idea or impression of") and Webster's Third New International Dictionary 610 (1986) (to "describe" is to "convey an image or notion of") with P. Peters, The Cambridge Guide to English Usage 355 (2004) (defining a "modifie[r]" as a word that "qualifies" a noun).

The common rules of grammar make the broad scope of the word "described" obvious. They demonstrate that a noun often is "described" by more than just the adjectives that modify it. Consider the following sentence: "The well-behaved child was taken by a generous couple to see *Hamilton*." That sentence, written in the passive voice, describes the "child" not only as "well-behaved" but also as someone "taken by a generous couple to see *Hamilton*." The description of the child would not differ were we to write the sentence in the active voice: "The generous couple took the well-behaved child to see *Hamilton*." The action taken by the "generous couple" ("took . . . to see *Hamilton*") still "describes" the "child," even though these words do not "modify" the word "child." That is because a person who has been subjected to an action can be described by that action no less than by an adjective. See Peters, *supra*, at 386 (describing such a person as someone "affected by the action"); B. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 452 (2016) (describing such a person as someone who "is acted on by or receives the action"); see also R. Huddleston & G. Pullum, The Cambridge Grammar of the English Language 1436 (2002) (noting the "large-scale overlap" between adjectives and certain verb forms).

An example illustrates how these principles apply to the statute at issue here. Imagine the following cookbook recipe. Instruction (1) says: "(1) Remove the Angus steak from the grill when the steak is cooked to 120 degrees Fahrenheit." Instruction (4) says: "(4) Let the steak described in Instruction (1) rest for ten minutes and then

serve it." What would we say of a chef who grilled an
Angus steak to 185 degrees Fahrenheit, served it, and
then appealed to these instructions—particularly the word
"described" in Instruction (4)—as a justification? That he
was not a good cook? That he had an odd sense of humor?
Or simply that he did not understand the instructions?
The chef would have no good textual defense: The steak
"described in Instruction (1)" is not just an "Angus" steak,
but an "Angus" steak that must be "remove[d] . . . when
the steak is cooked to 120 degrees Fahrenheit." By the
same logic, the alien in paragraph (1) is "described" not
only by the four clauses—A, B, C, and D—that directly
modify the word "alien," but *also* by the verb ("shall take")
and that verb's modifier ("when the alien is released").

The majority argues that "the crucial point" is that the
phrase "when the alien is released" plays "no role in iden-
tifying for the Secretary *which* aliens she must immediately
arrest." *Ante*, at 13. That may be so. But why is that a
"crucial point" in the majority's favor? After all, in the
example above, the words "[r]emove . . . from the grill
when the steak is cooked to 120 degrees Fahrenheit" do
not tell our chef what kind of steak to cook in the first
place. (The word "Angus" does that.) Even so, those
words still "describe" the steak that must be served in
Instruction (4). Why? Because by the time our chef gets
to Instruction (4), the recipe contemplates that the action
in Instruction (1) has been completed. At that point, the
"steak described in Instruction (1)" is a steak that has
been cooked in the manner mandated by Instruction (1).

The same is true of the two paragraphs before us. The
key word "described" appears not in paragraph (1), but in
paragraph (2). Paragraph (2) refers back to the entirety of
paragraph (1). And because paragraph (2) is the *release*
provision, it contemplates that the action mandated by
paragraph (1)—namely, detention—has already occurred.
Thus, the function of the phrase "an alien described in

paragraph (1)" is not to describe who must be detained, but instead to describe who must be denied bail.

In short, the language demonstrates that an alien is "described in paragraph (1)"—and therefore subject to paragraph (2)'s bar on bail hearings—only if the alien is "take[n] into custody . . . when the alien is released."

B

The statute's structure and context support this reading of the phrase "an alien described in paragraph (1)."

*First*, "Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line." *NLRB* v. *SW General, Inc.*, 580 U. S. ___, ___ (2017) (slip op., at 9). Congress employed that structure "to make precise cross-references" throughout the immigration code. *Ibid.* As relevant here, in a different detention provision enacted alongside the provision at issue here, Congress said that the Government "may release the alien only if the alien is an alien described in subparagraph (A)(ii) or (A)(iii)." Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), §303(b)(3)(B), 110 Stat. 3009–587. Yet Congress did not make such a precise cross-reference in paragraph (2): It did not refer to "an alien described in subparagraphs (A)–(D) of paragraph (1)," as it could have—and would have—done had it intended the majority's narrow interpretation. Instead, it referred to aliens "described" in *the entirety* of paragraph (1).

We usually "presume differences in language like this convey differences in meaning." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. ___, ___ (2017) (slip op., at 6). The cross-reference to all of paragraph (1) reinforces that "an alien described in paragraph (1)" is not just an ABCD alien, but an ABCD alien whom (in the words of paragraph (1)) the Secretary "take[s] into custody . . . when the alien is released" from criminal confinement.

*Second*, consider the structural similarity between subsections (a) and (c). See Appendix A, *infra*. The first sentence of subsection (a) sets forth a detention rule: An "alien may be arrested and detained" pending a decision on the alien's removal. 8 U. S. C. §1226(a). And the second sentence sets forth a release rule that allows for release on bond and parole. *Ibid.* Subsection (c) has a parallel structure. The first sentence (namely, paragraph (1)) says that the Secretary must "take into custody" a subset of those aliens "when the alien is released" from criminal custody. §1226(c)(1). And the second sentence (namely, paragraph (2)) sets forth the rule that "an alien described in paragraph (1)" generally may not be released. §1226(c)(2).

It is obvious that the second sentence of (a) applies only to those aliens who are detained following the rule in (a)'s first sentence. Parallel structure suggests that the same is true in (c): The second sentence of (c) applies only to those detained following the rule in (c)'s first sentence. Subsection (a)'s reference to (c) strengthens this structural inference: Subsection (a) says that its release rule applies "[e]xcept as provided in subsection (c)"—that is, except as provided in the *whole* of subsection (c), not simply paragraph (2) or the few lines the majority picks from (c)'s text.

Thus, the release rule in each subsection (the second sentence) applies only if the Secretary complies with the detention rule in that subsection (the first sentence). In light of "the parallel structures of these provisions," it would "flou[t] the text" to find that an alien is subject to (c)'s release rule, which forbids release, without also finding that the alien was detained in accordance with (c)'s detention rule, which requires the alien to be detained "when . . . released." *Chan* v. *Korean Air Lines, Ltd.*, 490 U. S. 122, 132 (1989).

The majority responds that subsections (a) and (c) do not "establis[h] separate sources of arrest and release

authority," and that (c) is merely "a limit" on the authority
granted by (a). *Ante*, at 15. But even if (c) were treated as
a "limit" on the authority granted by (a), the parallel
structure of the statute would still point to the same con-
clusion: The Secretary must comply with the limit on
detention in the first sentence of (c) in order to invoke the
rule on release in the second sentence of (c).

*Third*, Congress' enactment of a special "transition"
statute strengthens the point. When Congress enacted
subsection (c), it recognized that there might be "insuffi-
cient detention space" and "personnel" to carry out subsec-
tion (c)'s requirements. IIRIRA, §303(b)(2), 110 Stat.
3009–586. It therefore authorized the Government to
delay implementation of subsection (c)—initially for one
year, then for a second year. *Ibid.*

If the majority were correct that the "when . . . released"
provision does not set a time limit on the Secretary's
authority to deny bail hearings, then a special transition
statute delaying implementation for one year would have
been unnecessary. To avoid overcrowding, the Govern-
ment simply could have delayed arresting aliens for 1, 2,
5, or 10 years, as the majority believes it can do, and then
deny them bail hearings. What need for a 1-year transi-
tion period? The majority responds that the transition
statute still served a purpose: to "dela[y] the onset of the
Secretary's obligation to begin making arrests." *Ante*, at
21. But that just raises the question: Why would Congress
have needed to "dela[y] the onset of the Secretary's obliga-
tion" if it thought that the Secretary could detain aliens
without a bail hearing after a year-long delay? The major-
ity offers no good answer. The transition statute therefore
strongly suggests that Congress viewed the "when . . .
released" provision as a constraint on the Secretary's
authority to deny a bail hearing.

The transition statute also supports this conclusion in
another respect: It demonstrates that Congress anticipated

that subsection (c) would apply only to aliens "released" from state or federal prison. As noted, clauses A, B, C, and D in paragraph (1) cover some aliens who have never been in criminal custody. *Supra*, at 4. Even the majority acknowledges that it would be bizarre if these aliens could be detained without a bail hearing. *Ante,* at 23. The transition statute confirms as much: It indicates that "the provisions of [subsection (c)] shall apply to *individuals released* after" the transition period concludes. IIRIRA, §303(b)(2), 110 Stat. 3009–586 (emphasis added). From this it follows that Congress saw paragraph (2) as forbidding bail hearings only for aliens who have been "released." That, however, can be true only if the "when . . . released" provision limits the class of aliens subject to paragraph (2)'s "no-bail-hearing" requirement. The majority's contrary reading, under which paragraph (2) applies "regardless of . . . whether the alien was released from criminal custody," *ante*, at 25, conflicts with how Congress itself described the scope of subsection (c) when it enacted the statute.

## C

Even if statutory text and structure were not enough to resolve these cases, the Government's reading would fail for another reason. A well-established canon of statutory interpretation provides that, "if fairly possible," a statute must be construed "so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916). See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988) (using word "serious" instead of "grave"). The Government's reading of the statute, which the majority adopts, construes the statute in a way that creates serious constitutional problems. That reading would give the Secretary authority to arrest and detain aliens years after

they have committed a minor crime and then hold them
without a bail hearing for months or years. This possibil-
ity is not simply theoretical. See Appendix B, *infra*.

In *Jennings*, I explained why I believe the practice of
indefinite detention without a bail hearing likely deprives
a "person" of his or her "liberty . . . without due process of
law." U. S. Const., Amdt. 5. See 583 U. S., at ___ (dissent-
ing opinion) (slip op., at 5). This practice runs counter to
"those settled usages and modes of proceeding existing in
the common and statute law of England, before the emi-
gration of" the Founders' "ancestors." *Murray's Lessee* v.
*Hoboken Land & Improvement Co.*, 18 How. 272, 277
(1856). It runs counter to practices well established at the
time of the American Revolution. *Jennings*, *supra,* at ___–
___ (slip op., at 9–10). And it runs counter to common
sense: Why would the law grant a bail hearing to a person
accused of murder but deny it to a person who many years
before committed a crime perhaps no greater than pos-
sessing a stolen bus transfer? See Appendix B, *infra*.

I explained much of the constitutional problem in my
dissent in *Jennings*. Rather than repeat what I wrote
there, I refer the reader to that opinion. See *Jennings*,
*supra,* at ___ (slip op., at 1). I add only the obvious point
that a bail hearing does not mean release on bail. It simply
permits the person held to demonstrate that, if released,
he will neither run away nor pose a threat. It is especially
anomalous to take this opportunity away from an alien
who committed a crime many years before and has since
reformed, living productively in a community.

The majority's reading also creates other anomalies. As
I have said, by permitting the Secretary to hold aliens
without a bail hearing even if they were not detained
"when . . . released," the majority's reading would allow
the Secretary to hold indefinitely without bail those who
have never been to prison and who received only a fine or
probation as punishment. *Supra*, at 4, 10–11. See, *e.g.*,

§1226(c)(1)(A) (incorporating §1182(a)(2), which covers controlled substance offenses for which the maximum penalty exceeds one year); Brief for Advancement Project et al. as *Amici Curiae* 19, 24, 29 (describing examples). That fact simply aggravates the constitutional problem.

## III

Although the Court of Appeals correctly concluded that paragraph (2)'s prohibition on release applies only to an alien whom the Secretary "take[s] into custody . . . when the alien is released" from criminal custody, it also held that the phrase "when the alien is released" means that the Secretary must grant a bail hearing to any alien who is not "'immediately detained' when released from criminal custody." *Preap* v. *Johnson*, 831 F. 3d 1193, 1207 (CA9 2016). I disagree with the Court of Appeals as to the meaning of the phrase "when the alien is released."

## A

As an initial matter, the phrase "when the alien is released" imposes an enforceable statutory deadline. I cannot agree with JUSTICE ALITO, who writes for a plurality of the Court on this point, that our cases holding certain statutory deadlines unenforceable are applicable here. *Ante*, at 17. See, *e.g.*, *Barnhart* v. *Peabody Coal Co.*, 537 U. S. 149, 152 (2003) (holding that the Government's untimeliness did not bar it from taking action beyond the statutory deadline); *United States* v. *Montalvo-Murillo*, 495 U. S. 711, 713–714 (1990) (holding that a provision requiring a detention hearing to "'be held immediately'" did not bar detention in the event of a late hearing); *Brock* v. *Pierce County*, 476 U. S. 253, 266 (1986) (holding that the Government's failure to observe a 120-day statutory deadline did not deprive it of authority under the statute).

I disagree with the plurality on this point because our case law makes clear that a statutory deadline against the

Government must be enforced at least in contexts where
"other part[s]" of the relevant statutes indicate that the
time limit must be enforced, *Montalvo-Murillo*, *supra,* at
717; see also *Barnhart*, *supra*, at 161, 163; *Dolan* v. *United
States*, 560 U. S. 605, 613 (2010); where the statute
"'specif[ies] a consequence for noncompliance'" with the
time limit, *Barnhart*, *supra,* at 159 (quoting *United States*
v. *James Daniel Good Real Property*, 510 U. S. 43, 63
(1993)); or where the harms caused by the Government's
delay are likely to be serious, see *Dolan*, *supra,* at 615–
616; *Montalvo-Murillo*, *supra,* at 719–720.

Here, the special transition statute Congress enacted
alongside subsection (c) makes clear that Congress ex-
pected that the mandate that an alien be detained
"when . . . released" would be enforceable. Congress nei-
ther wished for nor expected the Secretary to detain aliens
more than a year after their release from criminal custody.
IIRIRA, §303(b)(2), 110 Stat. 3009–586. Why else would
Congress have enacted a statute permitting the Govern-
ment, due to "insufficient detention space and Immigra-
tion and Naturalization Service personnel," to delay im-
plementation of the entirety of subsection (c) for one year?
*Ibid.* As I have said, had Congress read the phrase "when
the alien is released" as the plurality now reads it, the
Government could have delayed implementation for as
long as it liked without the need for any transition statute.
*Supra,* at 10. The transition statute demonstrates that
Congress viewed the phrase "when the alien is released"
as imposing a deadline. Based on the transition statute,
the Secretary may not delay detention under subsection (c)
for longer than one year.

Moreover, the statute does "'specify a consequence'" for
the Secretary's failure to detain an alien "when the alien is
released." *Barnhart*, *supra,* at 159 (quoting *James Daniel
Good*, *supra,* at 63). In that case, subsection (c) will not
apply, and the Secretary must fall back on subsection (a),

the default detention and release provision. Critically, subsection (a) does not guarantee release. Rather, it leaves much to the Government's judgment: By regulation, aliens who are subject to subsection (a)'s default detention and release rules will simply receive a hearing at which they can attempt to demonstrate that, if released, they will not pose a risk of flight or a threat to the community. 8 CFR §§236.1(d)(1), 1236.1(d)(1).

Finally, I have already mentioned the many harms that could befall aliens whom the Secretary does not detain "when . . . released." They range from long periods of detention, to detention years or even decades after the alien's release from criminal custody, to the risk of splitting up families that are long established in a community. *Supra,* at 4. Thus, unlike some of our prior cases, the harm from a missed deadline hardly can be described as "insignificant." *Montalvo-Murillo*, *supra,* at 719.

The plurality objects that "Congress could not have meant for judges to 'enforce'" the mandatory detention requirement "in case of delay by—of all things—forbidding its execution." *Ante*, at 19. But treating the "when the alien is released" clause as an enforceable limit does not prohibit the Secretary from detaining the aliens that subsection (c) requires her to detain. Rather, the Secretary's failure to comply with the "when the alien is released" clause carries only one consequence: The Secretary cannot deny a bail hearing.

B

So what does the phrase "when the alien is released" mean? The word "when" can, but does not always, mean "[a]t the time that," American Heritage Dictionary, at 1971, or "just after the moment that," Webster's Third New International Dictionary, at 2602. But the word only "[s]ometimes impl[ies] suddenness." 20 Oxford English Dictionary 209 (2d ed. 1989). It often admits of at least

some temporal delay.  A child who is told to "mow the lawn, please, when you get home from school" likely does not have to mow the lawn the second she comes into the house.  She can do a few other things first.

Mindful of "the greater immigration-related expertise of the Executive Branch" and "the serious administrative needs and concerns inherent in the necessarily extensive [Government] efforts to enforce this complex statute," I would interpret the word "when" in the same manner as we interpreted other parts of this statute in *Zadvydas* v. *Davis*, 533 U. S. 678, 700 (2001).  The words "when the alien is released" require the Secretary to detain aliens under subsection (c) within a reasonable time after their release from criminal custody—presumptively no more than six months.  If the Secretary does not do so, she must grant a bail hearing.  This presumptive 6-month limit is consistent with how long the Government can detain certain aliens while they are awaiting removal from the country.  *Id.,* at 682, 701 (interpreting a different provision, §1231(a)(6)).  To insist upon similar treatment in this context would give the Government sufficient time to detain aliens following their release from local, state, or federal criminal custody.  It would also ensure that the Government does not fall outside the 1-year maximum dictated by the transition statute.  See *supra*, at 10, 14.

## IV

To reiterate: The question before us is not "narrow." *Ante,* at 2 (KAVANAUGH, J., concurring).  See *supra,* at 4. That is because we cannot interpret the words of this specific statute without also considering basic promises that America's legal system has long made to all persons. In deciphering the intent of the Congress that wrote this statute, we must decide—in the face of what is, at worst, linguistic ambiguity—whether Congress intended that persons who have long since paid their debt to society

would be deprived of their liberty for months or years
without the possibility of bail.  We cannot decide that
question without bearing in mind basic American legal
values: the Government's duty not to deprive any "person"
of "liberty" without "due process of law," U. S. Const.,
Amdt. 5; the Nation's original commitment to protect the
"unalienable" right to "Liberty"; and, less abstractly and
more directly, the longstanding right of virtually all per-
sons to receive a bail hearing.

   I would have thought that Congress meant to adhere to
these values and did not intend to allow the Government
to apprehend persons years after their release from prison
and hold them indefinitely without a bail hearing.  In my
view, the Court should interpret the words of this statute
to reflect Congress' likely intent, an intent that is con-
sistent with our basic values.  To speak more technically, I
believe that aliens are subject to paragraph (2)'s bar on
release only if they are detained "when . . . released" from
criminal custody.  To speak less technically, I fear that the
Court's contrary interpretation will work serious harm to
the principles for which American law has long stood.

   For these reasons, with respect, I dissent.

## APPENDIXES

### A

**8 U. S. C. §1226**. "Apprehension and detention of aliens

"(a) Arrest, detention, and release

"On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

"(1) may continue to detain the arrested alien; and

"(2) may release the alien on—

"(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

"(B) conditional parole;

.          .          .          .          .

"(c) Detention of criminal aliens

"(1) Custody

"The Attorney General *shall take into custody* any alien who—

"(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

"(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

"(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

"(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

"*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

Appendix A to the opinion of BREYER, J.

"(2) Release

"The Attorney General may release *an alien described in paragraph (1)* only if the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." (Emphasis added.)

B

The following citations support the claims made *supra*, at 4, regarding the breadth of the Government's reading of the statute.  I do not intend to suggest that these citations provide a complete description of the many aliens who are detained without a bail hearing under 8 U. S. C. §1226(c). See *Jennings* v. *Rodriguez*, 583 U. S. \_\_\_, \_\_\_ (2018) (BREYER, J., dissenting) (slip op., at 3) (indicating that thousands of aliens are eligible to be detained under sub-section (c), that many are held for six months or longer, and that "[n]early 40% of those who have served criminal sentences receive relief from removal"); *Preap* v. *Johnson*, 831 F. 3d 1193, 1197 (CA9 2016) (noting that one respond-ent was detained 11 years after his release from prison); Brief for Advancement Project et al. as *Amici Curiae* 12 (presenting data from a recent lawsuit in Massachusetts indicating that more than one in five aliens detained under subsection (c) were taken into custody more than five years after their release from prison); §1226(c)(1)(A) (referencing §1182(a)(2), which includes aliens who have committed federal or state controlled substance offenses for which the maximum term of imprisonment exceeds one year); §1226(c)(1)(C) (referencing §1227(a)(2)(A)(i), which applies to aliens convicted of certain crimes "involving moral turpitude"); *Hashish* v. *Gonzales*, 442 F. 3d 572, 576 (CA7 2006) (illegally downloading music is a crime of "moral turpitude"); *Michel* v. *INS*, 206 F. 3d 253, 261 (CA2 2000) (possessing stolen bus transfers is a crime of "moral turpitude"); §1226(c)(1)(D) (referencing §1182(a)(3)(B), which covers the "spouse or child" of certain aliens en-gaged in terrorist activity); §1229b (identifying the re-quirements for obtaining cancellation of removal).